UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ELISA E. PUNO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 06-106-B-W |
| | ) | |
| MOUNT DESERT ISLAND HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Elisa E. Puno sued her former employer, Mount Desert Island Hospital, in state court for allegedly subjecting her to employment discrimination based upon her gender and race and a retaliatory discharge based on a complaint she made to supervisors concerning a co-worker's violation of certain patient privacy precepts imposed on the hospital under federal law.  I recommend that the Court deny the defendant's pending motion for summary judgment (Docket No. 7) as to both the state whistleblower's claim and the employment discrimination claims under federal and state law.

**Facts**

The following statement of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this District's summary judgment practice.  See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).  When a statement offered by a party is uncontested and is supported by a citation to record material having evidentiary quality, the statement has been set forth herein

essentially as offered.  When a statement of fact is contested and the evidentiary record is capable of supporting alternative findings of fact, the statement in dispute has been characterized, for purposes of summary judgment only, in the manner favorable to, or favored by, the non-movant.  Merch. Ins. Co. v. U.S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

Mount Desert Island Hospital (MDIH) hired Elisa Puno in April of 2003 to work as an environmental services aide (ESA) in its environmental services department (ESD), where she was responsible for cleaning certain buildings on the MDIH campus.  (Def.'s Statement of Material Facts (SMF) ¶¶ 1, 2, Docket No. 8.)  Puno's direct supervisor in this position was Phil Beaudoin, who supervises the ESD.  (Id. ¶ 3.)  Phil Beaudoin is supervised, in turn, by Doug Springer, MDIH's director of physical plant services.  (Id. ¶ 4.)  Christopher Owen serves MDIH as its director of human resources.  (Id. ¶ 6.)

On June 13, 2005, Puno notified Owen that she had heard one of her coworkers, Bob Kimball, discussing a particular patient and saying (incorrectly) that the patient probably had AIDS and warning other employees to be careful around the patient.  (Id. ¶¶ 8, 15.)  Puno told Owen that after asking Bob Kimball to repeat his assertion, another employee, Rayma Kimball (Bob Kimball's wife), stated, "she has AIDS."  (Id. ¶ 9.)  Puno notified Owen because she was concerned that the statements violated the Health Insurance Portability and Accountability Act, a federal act that includes provisions requiring health care providers to protect the confidentiality of their patients' health information.  See 42 U.S.C. §§ 1320d et seq.  Owen referred Puno to Jennifer Abbott, a quality and compliance officer at the hospital.  (Id. ¶¶ 10-11.)  Based on Puno's representations Abbott created an occurrence report.  (Id. ¶ 12.)  Owen and Abbott told Puno that she was right to report the incident.  (Id. ¶ 13.)

On June 16, 2005, Abbott spoke with Springer and Springer agreed to investigate the matter.  (Id. ¶ 17.)  From Springer the matter made its way down to Beaudoin, who also supervises the Kimballs.  (Id. ¶¶ 8, 18.)  Beaudoin told Springer that what the Kimballs were alleged to have said was the kind of thing ESD employees commonly talk about with each other.  (Id. ¶ 19.)  Springer also spoke with Bob Kimball, who denied having made the statement attributed to him.  (Id. ¶ 20.)  Around the same time Beaudoin informed the Kimballs that it was Puno who had reported them.[1]  (Id. ¶ 27.)  Springer and Abbott subsequently conducted privacy awareness training for the ESD at a mandatory meeting.  (Id. ¶¶ 23-24.)

Linden Buzzell is Puno's boyfriend and was also an employee in the ESD at MDIH.  (Id. ¶ 52; Pl.'s Statement of Additional Material Facts (SAMF) ¶ 177, Docket No. 19.)  Buzzell's son, Logan Michaud, also worked in the ESD.  (SAMF ¶ 179.)  Following Puno's HIPAA report, Beaudoin yelled and screamed at Buzzell in Beaudoin's office, saying "that people doing what they were doing to Bob and Rayma was going to stop" and Beaudoin stated that he knew Elisa had made a complaint.  (Id. ¶ 183; Buzzell Dep. at 49, 51-53,[2] Docket No. 27.)  The Kimballs were also angered by the report where they previously would say hello to Puno in passing, they ceased doing so.  (Id. ¶¶ 32, 33.)  In addition, according to Puno, Bob Kimball began directing epithets at her when their paths crossed at work (they did not work in close proximity to one another and crossed paths primarily when Puno was clocking in, taking a break, or clocking out).  (Id. ¶¶ 36-37.)  On one occasion in June, a few days after Puno made the HIPAA report, Bob Kimball called Puno a "fucking Asian bitch."  (Id. ¶¶ 38-39.)  Puno was upset but did not

---

[1]    Puno wishes to introduce a disciplinary memorandum issued to Rayma Kimball from Doug Springer that tends to demonstrate why Puno's HIPAA report was an especially sensitive matter for the Kimballs.  (SAMF ¶¶ 188-190.)  Puno merely cites the document, without also citing an affidavit or deposition testimony that would serve to authenticate the document.  Consequently, the memorandum is inadmissible in the manner introduced and I am compelled to sustain MDIH's objection.  The same problem arises with respect to a July 2005 evaluation and two July 2005 medical notes that Puno seeks to introduce.  (SAMF ¶¶ 191-193.)

[2]    Puno cites pages 48, 49 and 52, but my perusal ran over the intervening pages and onto page 53.

3

respond.  (Id. ¶ 40.)  The next day, Puno told Beaudoin about Bob's comment and Beaudoin responded that he did not believe Bob would say such a thing.  (Id. ¶ 41.)  Puno therefore called Springer and left him a message about the matter.  (Id. ¶ 42.)  Springer did not return her call. (Id. ¶ 43.)

A few days later, likely also in June, Bob Kimball called Puno a "fucking cunt."  (Id. ¶ 46.)  Puno reported the matter to Beaudoin and he, once again, stated that he did not believe Bob Kimball would speak that way to her.  (Id. ¶¶ 48-49.)  Puno left Beaudoin's office upset and crying, but finished her shift.  (Id. ¶ 50.)  The next morning Puno experienced an anxiety attack and had thoughts of suicide because she was worried that she did the wrong thing by making the HIPAA complaint.  (Id. ¶ 51.)  Buzzell took her to the emergency room, where she told a doctor about her symptoms and that she was afraid she was going to lose her job.[3]  (Id. ¶ 52.)  The doctor prescribed her some medication to help her relax and sleep.  (Id. ¶ 53.)  Puno was absent from work on the day of her visit to the emergency room and she missed the next day as well. (Id. ¶ 54.)  A fair inference is that the two absences occurred on June 27 and 28, because of their temporal proximity to the late June insults by Bob Kimball.  Despite the circumstances, MDIH held these absences against her as unexcused.  (Id. ¶¶ 51, 113.)  On another occasion, probably in late June, Puno overheard Rayma Kimball tell Bob Kimball that Puno was "a professional liar." (Id. ¶ 44.)  At around the same time (not the same day), Bob Kimball called Puno a "Filipino bitch."  (Id. ¶ 55.)  Puno did not respond to either Kimball.  (Id. ¶¶ 45, 57.)  However, she did visit Owen's office the next day to report Bob Kimball's use of epithets as well as Beaudoin's refusal to take her seriously.  (Id. ¶¶ 58-59.)  According to Puno, Owen did not ask any questions or take any notes, but merely fidgeted with his pen and looked at the wall, so Puno just left.  (Id.

---

[3]      In her memorandum of law Puno attributes her anxiety and thoughts of suicide to Bob Kimball's epithets, but she admits MDIH's statement that these symptoms arose "because she was worried that she did the wrong thing by making the HIPAA complaint."  (SMF ¶ 51.)

¶ 60.)  Thereafter, neither Kimball directed any offensive comments at Puno or at anyone within

Puno's hearing,[4] but Bob Kimball continued to give her bad looks whenever he saw her and

tossed things on the floor in her presence to annoy her.    (Id. ¶¶ 61-62, 64-65.)  Rayma Kimball

would slam the door when she saw Puno.  (Id. ¶ 66.)

On July 4, 2005, a day on which Puno was not scheduled to work, Beaudoin scheduled

Bob Kimball to perform a "special project cleaning," or "deep cleaning," of MDIH's Family

Health Center, a building that Puno was responsible for cleaning.  The record could support a

finding that this project cleaning was an impromptu cleaning and that such a cleaning was

unnecessary because one had recently been performed in May.  (Id. ¶¶ 67, 69, 70; Pl.'s Opposing

Statement of Material Facts (OSMF) ¶ 68 & SAMF ¶ 184-185.)  Usually, when Bob Kimball

was scheduled to undertake a special project cleaning of one of Puno's buildings, Beaudoin

would notify Puno a week or more in advance, but this time she received no notice.  (Id. ¶¶ 72-

73; SAMF ¶ 195.)  Following the deep cleaning, Bob Kimball presented Beaudoin with a

vacuum cleaner bag "plugged full of dirt" and made certain proclamations to Beaudoin about

how dirty the carpets were in the building and that he could not believe the dirt.  (SMF ¶¶ 74-76.)

Puno returned to work on July 5 and Beaudoin presented the vacuum bag to her, saying

that the Kimballs had cleaned the Family Health Center and asking her whether she had been

vacuuming the floors there.  (Id. ¶¶ 77-79.)  Puno became very angry and said that Bob was just

---

[4]        Puno admits this fact, which is significant because it undercuts representations made in Puno's summary
judgment affidavit that Bob Kimball called her a "fucking idiot" on approximately five occasions between July and
December 2005.  (Puno Aff. ¶ 6, Docket No. 19-4.)  Puno's effort to advance the "fucking idiot" comments despite
this admission is odd, to say the least.  These statements and other conduct set forth in paragraphs 201 through 206
of Puno's additional statement are also objected to by MDIH on the ground that they contradict Puno's deposition
testimony, in which she denied any additional harassment by the Kimballs after her complaint to Owen.  (Puno Dep.
at 118:25-119:16 & 152:21-153:1.)  This is a perfectly valid objection, see Colantuoni v. Alfred Calcagni & Sons,
44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he
cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give
a satisfactory explanation of why the testimony is changed."), to which Puno offers no response.  I sustain the
objection.

trying to get her in trouble.  (Id. ¶ 80.)  Puno told Beaudoin that she was too upset to work and needed to go home.  (Id. ¶ 84.)  Before she left, Beaudoin spoke to her about her attendance, which had been poor thus far that year, and told her that it needed to improve.  (Id. ¶ 85.)  Puno missed two days on account of this emotionally upsetting development and, on one of these days, met with Owen to make a retaliation charge, discussed below.[5]  Despite the circumstances, MDIH held both absences against her as unexcused.  (Id. ¶ 54 (citing Puno Dep. at 132, discussing July 5 and 6 absences) & ¶ 113.)  Thus, as of July 7, Puno had 16 unexcused absences, including four stemming from Beaudoin's indifference to her report of Bob Kimball's racist and sexist insults and his apparent participation in what could be regarded as a harassing special cleaning project.  (Id. ¶ 86.)

On July 6, Puno and Buzzell met with Owen and with Ruth Lyons, a vice president of quality, to talk about the fact that the Kimballs had performed the unnoticed special project cleaning and about how Beaudoin had spoken with her concerning the vacuum bag.  (Id. ¶¶ 87-88, 91.)  Puno alleged that Beaudoin and the Kimballs were retaliating against her for the HIPAA report by setting up an unnecessary cleaning and she also asserted that the amount of dirt they reported was a fabrication.  (Id. ¶ 90, 92.)  She also asserted that Beaudoin's complaint about her attendance was in retaliation for her HIPAA report against the Kimballs.  (Id. ¶¶ 93-94.)  She did not complain further about any name calling, though she had already complained of that to Owen.  (Id. ¶ 95.)  Puno made no mention of the anxiety attack she suffered, either, but this event also predated her earlier visit to Owen's office.  (Id. ¶ 97.)   Owen told Puno that he would investigate the matter.  (Id. ¶ 98.)

---

[5]     Puno may have visited the emergency room on this occasion with complaints similar to those made at her earlier visit.  She makes that assertion at paragraphs 192 and 193 of her additional statement, but evidentiary obstacles get in the way of a clear statement.  (See note 1, supra.)

Owen investigated the matter by speaking with Beaudoin.  Beaudoin told Owen that the deep cleaning was supposed to have occurred in May, but did not occur until July, and that Bob Kimball was possibly using a more powerful vacuum.  (Id. ¶¶ 100-102, 104.)  Beaudoin also told Owen that his attendance records reflected 16 unexcused absences in 2005.  (Id. ¶ 106.)  On July 8, 2005, Owen wrote to Puno and stated that he did not regard the circumstances of the special cleaning project as demonstrating retaliatory harassment, making no reference to the Kimballs' verbal harassment.  (Id. ¶¶ 107-108.)  Puno did not suffer any negative employment actions or receive any criticism based on poor performance in connection with the special project cleaning. (Id. ¶ 110.)  However, on what appears to have been the day Owen wrote his letter to Puno denying the existence of retaliatory harassment, Beaudoin wrote a memo to Owen and Springer, outlining Puno's absences thus far in 2005 and stating that he was considering placing her on probation for attendance if she had two unexcused absences in any given month moving forward. (Id. ¶ 116.)  On July 8, Springer responded to Beaudoin's memo by email, indicating that "the way to proceed with [Puno] is to do exactly what [Beaudoin] did with Logan."  (Id. ¶ 120.)  By "Logan," Springer meant Logan Michaud, a man placed on probation on July 7, in the midst of the Puno retaliation investigation, for having 19 unexcused absences to date.  (Id. ¶¶ 121-122.) Beaudoin had drafted a letter to Michaud, telling him that he was being placed on probationary status and would be terminated if he had any unexcused absences in the next 30 days.[6]  (Id. ¶ 123.)  Beaudoin shared his knowledge of these developments with Bob and Rayma Kimball. (SAMF ¶ 182.)

MDIH's attendance policy defines "excessive absenteeism," in part, as "a pattern of one or more absences a month."  (Id. ¶ 112.)  MDIH supervisors differentiate between planned and

---

[6]     Michaud did not report to work on July 9 and 10 and was then terminated for excessive absenteeism.  (SMF ¶ 127.)

unplanned absences.  The former are excused and the latter are unexcused.  MDIH allows employees to use "accrued earned time" for any absence, whether excused or unexcused.  (Id. ¶ 134.)  If an employee uses earned time for an unexcused absence and does not have any accrued earned time left when he or she has an excused absence, such as a vacation, then the employee's excused absence will be unpaid.  (Id. ¶ 135.)  It appears from this state of affairs that excused absences for which no earned time is available are simply unpaid; it does not appear that such excused absences become unexcused.

Although Springer's July 8 email advised Beaudoin to place Puno on probation for her attendance, Beaudoin did not put Puno on probation at that time. (Id. ¶ 128.)  Puno was scheduled to work, but called in sick, on August 9, 10, 11, and 12.  (Id. ¶¶ 129, 132-133.)  These four absences were unplanned and therefore are defined as unexcused.  (Id. ¶ 130.)  Puno used earned time for these absences and received 22 hours of pay for these earned time absences.[7] (Id. ¶ 136; see also Docket No. 12-5, pp. 4 of 5.)  On August 15, 2005, when Puno next reported to work, Beaudoin told Puno that he was placing her on probation for poor attendance and that she would be terminated if she had any unexcused absences during the next 30 days.  (Id. ¶¶ 139-140.)  As a consequence of this use of earned time, Puno did not have enough earned time remaining to make her planned vacation absences of August 22 through 25 paid time off.  (Id. ¶ 137.)  Nevertheless, the absences were planned and, therefore, excused.  Puno had no absences in September or October and, thus, completed the probationary period successfully.  (Id. ¶ 141; SAMF ¶ 197.)  Despite making it through probation, Puno understood that she needed to maintain good attendance going forward.  (SMF ¶ 142.)

On or about October 19, 2005, Beaudoin discussed Puno's recent performance evaluation with her.  (Id. ¶ 143.)  In the evaluation, Beaudoin noted that Puno was not completing all of the

---

[7]     Puno generally worked a five-hour shift.  (SMF ¶ 34.)

dusting in her assigned areas and he attributed that to her poor attendance.  (Id. ¶ 144.)  In the "goals for the coming year" section of Puno's October 2005 performance evaluation, Beaudoin wrote "maintain good attendance."  (Id. ¶ 145.)  In the "evaluator comments" section of the evaluation, Beaudoin wrote as follows: "My primary concern this year has been that of poor attendance and the effects it has on the E.S. operations and staffing/schedule changes.  Also of concern has been the shortened work shifts and high frequency of Elisa forgetting to clock out."  (Id. ¶ 146.)

Puno had one unexcused absence on November 14.  (Id. ¶¶ 113, 148, 149.)  That absence appears to have gone by without consequence.  However, Puno had five consecutive unexcused absences on December 12, 13, 14, 15, and 16.  (Id. ¶ 113, 149.)  Puno was unable to obtain transportation to work on those days because her car had broken down.  (Id. ¶ 149.)  On December 12 Puno called Beaudoin to report her car problems and requested assistance with getting to work.  She asked whether someone from the hospital could come pick her up.  (SAMF ¶ 224.)  Puno attests that the hospital routinely provided transportation to employees under various circumstances and had a van available for that purpose.  (Id. ¶¶ 225, 229.)  Beaudoin told her he did not think he could provide her with transportation.[8]  (Id. ¶ 226.)  Puno called in to Beaudoin on each of the subsequent days she was absent and requested that someone named Dwayne give her a ride to work, to which Beaudoin is reported as responding that Dwayne was too busy to help.  (Id. ¶¶ 227-228.)  Puno called Beaudoin on December 15 to say that she could not be at work and Beaudoin told her that she would be terminated if she did not make it in by December 19.  (SMF ¶ 150.)  Beaudoin then reported the matter to Springer, and according to Beaudoin and Springer, Springer felt strongly that Puno should be terminated.  (Id. ¶¶ 151-152.)

---

[8]        Beaudoin acknowledges in a responsive affidavit that it is his practice to offer transportation under the circumstances described by Puno, but he maintains that she never asked for transportation and declined transportation when he offered it.  (Beaudoin Second Aff. ¶ 17, Docket No. 23.)

When Puno reported to work on Monday, December 19, Beaudoin told her that he had spoken with Springer and that they had decided she must be terminated for excessive absenteeism.  (Id. ¶ 153.)

Puno was not the only employee in the ESD who's attendance ran afoul of the policy definition of excessive absenteeism.  One employee had six months with 1 or more absences, another had five such months, and two others had three or four such months.  (SAMF ¶ 199; Def.'s Reply Statement (RS) ¶ 199.)  One employee having four months with 1 or more absences was absent on four occasions in December 2005, the month in which Puno was terminated for her absenteeism.  (SAMF ¶ 200.)

During Linden Buzzell's tenure at MDIH, he has served as the assistant to Phil Beaudoin. In that capacity Buzzell gained direct knowledge of scheduling and attendance matters.  (Id. ¶ 207.)  Buzzell attests that he has observed Beaudoin modify the schedules to support employees he favored and discipline those he did not.  (Id. ¶ 208.)  On one occasion, according to Buzzell, Beaudoin marked Bob and Rayma Kimball as absent over a weekend and subsequently discarded the record that reflected their absences, informing Buzzell that the absences had been approved. (Id. ¶¶ 210-211.)  On another occasion, Rayma Kimball was absent for four days due to illness. When Buzzell reviewed the attendance records covering the time period that should have recorded these absences they made no reference to Kimball's absence.  (Id. ¶¶ 212-214.)  Mr. Buzzell has reviewed the ESD work assignment schedules for 2005, which record employee absences and other matters.  (Id. ¶ 215.)  He asserts that he knows the records are inaccurate with respect to certain employee absences, presumably through July of 2005, when his employment at MDIH ended.  He states that the absences of certain employees are simply not reported.  (Id. ¶¶ 216-218, 221.)  He further asserts that he knows for a fact that Ms. Puno was not the most

frequently absent employee in ESD, although his employment ended several months prior to the date of Puno's termination.  (Id. ¶ 223; RS ¶ 223.)  According to Beaudoin, though, Puno had the most absences of any employee in the ESD.  (SMF ¶ 161.)  He further attests that no one else (other than Puno and Logan Michaud) had more than 10-12 unexcused absences for the year 2005.  (Id. ¶¶ 155-160.)

### Discussion

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required."  Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

MDIH argues that summary judgment should enter against Puno's hostile work environment claim and against her whistleblower claim as well. (Pl.'s Mot. for Summ. J. (MSJ) at 10, 14.) In its concluding paragraph MDIH asserts that these arguments entitle it "to summary judgment on Plaintiff's Complaint," suggesting that Puno does not assert any other claims in this civil action. (Id. at 19.) My impression of the whistleblower claim is that it is entirely viable on this record, whereas the hostile work environment claim exists somewhere along the border between actionable and non-actionable harassment. Despite this fact, MDIH does not even mention the possibility of a remand to state court, which makes me wonder whether there are additional federal claims that it has chosen to gloss over in its summary judgment papers. In opposition to the motion Puno advances exactly the two claims challenged by MDIH, without articulating any other theory, such as a Title VII retaliation claim under 42 U.S.C. § 2000e-3(a) premised on her complaints concerning Bob Kimball's racist and sexist statements or a claim for wrongful termination under 42 U.S.C. § 2000e-2(a). This has perplexed me somewhat because paragraphs seven and eight of the complaint allege wrongful termination apart from the hostile work environment claim stated in paragraphs five and six of the complaint. I am unsure whether Puno's failure to flag these additional claims in her opposition papers arises from the fact that MDIH failed to expressly challenge them or possibly due to a failure to include them in the administrative charge or some other impediment. I trust that these omissions can be explained in the parties' objections to my recommendation. I discuss below the contests briefed by the parties.

**A.     Hostile Work Environment**

MDIH argues that summary judgment should enter against Puno's sexual and racial harassment claims (counts I and II) because the facts on which she bases her claim do not reflect severe or pervasive harassment based on sex, race or national origin.  (Mot. Summ. J. (MSJ) at 10, Docket No. 7.)  Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Included within this broad prohibition is the maintenance or tolerance of a "discriminatorily hostile or abusive environment" by an employer.  Harris v. Forklift Sys., 510 U.S. 17, 21 (1993); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 394 (1st Cir. 2002).

> In order to prove a hostile work environment, a plaintiff must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment. The harassment must be "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment.

Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) (citing and quoting Faragher v. City of Boca Raton, 524 U.S. 775, 786-88 (1998)).  "When dealing with discriminatory harassment . . . there is seldom, if ever, a defensible purpose behind the injurious actions.  The only question is whether the bad acts, taken in the aggregate, are sufficiently severe or pervasive to constitute actionable harassment."  Id. at 92-93.  The same standard governs the state law claim.  Higgins v.

New Balance Athletic Shoe, Inc., 194 F.3d 252, 258 n.2 (1st Cir. 1999) (observing that "courts typically apply Title VII standards to claims of sexual harassment under the MHRA").

The summary judgment record could support a finding that Bob Kimball directed offensive racist and sexist epithets at Puno on three occasions over a three or four-week period, calling her a "fucking Asian bitch," a "fucking cunt," and a "Filipino bitch."  Although these statements are highly inflammatory, because they present only a limited group of co-worker statements they would appropriately be relegated, if treated in isolation, to the category of "mere offensive utterances" or else that of an "isolated incident."  However, when Puno twice reported Kimball's invective to Beaudoin, her immediate supervisor, he said on both occasions that he did not believe her and left it at that, despite the fact that he had fanned the flames of the HIPAA controversy by telling the Kimballs that Puno had made the report against them.  Also troubling is the fact that when Puno reported the first incident to Springer, her second-line supervisor, he made no response at all, requiring Puno to go over both their heads to report the matter to human resources.  When the matter was referred to Owen, he merely listened passively and twiddled his pen.  Although MDIH makes much of the summary judgment finding that the Kimballs engaged in no further verbal harassment after the matter came to Owen's attention, it also appears that Owen made no effort to address whether Bob Kimball had, in fact, directed vulgarities at Puno that were designed to demean her based on her race or origin and her sex.  This supervisor conduct complicates the analysis significantly, even though the trio of offensive statements in themselves would not otherwise be so severe or abusive as to subject the employer to liability.  What I mean to say is that whether severe harassment of an abusive nature can be found in this record depends on how one regards the collective conduct of Beaudoin, Springer and Owen in light of the kinds of allegations Puno made concerning mistreatment by the Kimballs.  It also

14

depends on how one regards Beaudoin, either as a supervisor determined to root out absenteeism in the ESD, or as a supervisor who foolishly set in motion the entire chain of events by disclosing Puno as the HIPAA informant, enabled that harassment by turning a deaf ear to Puno's complaints and advancing a bogus special project cleaning, then launched a campaign to terminate her employment for absenteeism, including absenteeism related to emotional upset at his mistreatment and absenteeism stemming from his refusal to provide Puno with transportation to work that was within his power to provide.

The "severe or pervasive" standard is prescribed in order to screen from trial those hostile work environment claims that, if permitted to go to trial, would effectively turn federal and state anti- harassment legislation into general workplace civility codes. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). In order to differentiate between potentially meritorious suits involving severely or pervasively hostile treatment and non-meritorious suits involving ordinary workplace hostility, trial judges are expected to use "common sense, and an appropriate sensitivity to social context." Ugurhan Akturk Kosereis v. R.I., 331 F.3d 207, 216 (1st Cir. 2003). The court is expected to consider all of the circumstances, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher, 524 U.S. at 787-788 (quoting Harris, 510 U.S. at 23). Thus, although questions regarding the severity or pervasiveness of harassment are ordinarily reserved for the factfinder when a plaintiff's evidence presents even a borderline case, Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir.2002), "summary judgment is an appropriate vehicle for 'policing the baseline for hostile environment claims.'" Pomales v. Celulares Telefonica, Inc.,

447 F.3d 79, 83 (1st Cir. 2006) (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th

Cir. 1999) (*en banc*)).

The trio of utterances at issue in this case included references to Puno's national origin or

race and vulgar references to her sex or gender, but they were unaccompanied by any physically

threatening circumstances, were made in passing by a co-worker who was not generally in

Puno's presence, and were not made in a context that exposed Puno to humiliation before her

peers.  Viewed objectively, and in context, these are not "extremely serious" incidents of

harassment that would independently remove this case from the "offensive utterances" or

"isolated incident" categories and into the severe harassment category.  One of Puno's arguments

is that the statements she attributes to Bob Kimball must be regarded as severe enough in

themselves to support a finding of actionable harassment because they are the kinds of

statements that have undermined the careers of Mel Gibson, Michael Richards (Kramer), and

Don Imus.  (Opp'n Mem. at 9, Docket No. 18.)  This argument is not persuasive, in my view.

The question is not whether a certain portion of the population would find the statements

sufficiently foul to end their support or patronage of a public figure, but whether a reasonable

person could fairly conclude that it had become a condition of her employment that she endure

severe or pervasive hostility at work on account of her membership in a protected class.

Puno's secondary argument is that the various disciplinary treatments she was made to

endure, including her ultimate termination, combine with Bob Kimball's statements to push this

case into the territory of severe or pervasive harassment.[9]  (Id. at 10-12.)  I agree that this case is

significantly complicated by these disciplinary matters, which could fairly be regarded as

harassing conduct.  See O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001)

("Courts should avoid disaggregating a hostile work environment claim, dividing conduct into

---

[9]      Puno also relies on facts that did not make it into the summary judgment record.  See note 5, supra.

instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct.").  In quick succession following Puno's HIPAA report and her complaints of Bob Kimball's treatment of her, Beaudoin participated in what could fairly be regarded as an effort by the Kimballs to make Puno look bad in relation to her job performance (the deep cleaning incident) and Beaudoin and Springer engaged in a very focused effort to terminate Puno based on absenteeism, which otherwise appears to be tolerated to a significant degree at MDIH, at least within the ESD.  This was an effort that had not previously been directed against Puno but arose in the wake of her HIPAA report and her complaints about Bob Kimball's offensive conduct toward her.  This effort also took advantage of four absences occasioned by Puno's emotional upset over Beaudoin's refusal to believe that Bob Kimball had called Puno racist and sexist names and his apparent duplicity in a workplace stunt designed to make her look bad.  A reasonable fact finder might regard such absences as excusable and an employer's reliance on them evidence of a malign purpose.  Finally, the effort took advantage of Beaudoin's decision to withhold transportation to Puno when such transportation was extended to otherwise similarly situated employees in the ESD.  Although I readily acknowledge that this case falls near the borderline between actionable and non-actionable circumstances, I nevertheless conclude that, taken collectively, and viewed in the light most favorable to Puno as they must be at this stage of the proceedings, these facts are sufficient to permit a reasonable person to conclude that this focused effort to terminate Puno's employment was a species of abuse reflecting severe hostility toward her person on account of her status not only as a whistleblower, but more to the point, as a "fucking Asian, Filipino, bitch, cunt" woman who had the audacity to blow the whistle against a favored white male employee and then expected to be taken seriously when she complained of bigoted retaliatory conduct targeting her race, sex and

17

place of origin.  Accordingly, I recommend that the Court DENY summary judgment in favor of MDIH in relation to the hostile work environment claims set forth in counts I and II of the complaint.  I extend my recommendation to the state law hostile work environment claim (count II) because MDIH correctly asserts that the same legal standard governs, see Paquin v. MBNA Mktg. Sys., Inc., 233 F. Supp. 2d 58, 64 (D. Me. 2002); Bowen v. Dep't of Human Servs., 606 A.2d 1051, 1053 (Me. 1992), and Puno makes no contrary assertion.

**B.      Wrongful Termination**

In the same count that outlines Puno's hostile work environment or "harassment" claim (count I), Puno alleges that she was "wrongfully terminated . . . in violation of her federal statutory rights to be free from employment discrimination."  (Compl. ¶ 7.)  As previously indicated, this assertion of wrongful termination causes me some concern over whether Puno's federal "employment discrimination" count includes some theory other than the hostile work environment claim asserted in her memorandum, such as a claim of wrongful termination per 42 U.S.C. § 2000e-2(a)(1) or a claim of retaliatory discharge per § 2000e-3(a) premised on her report of Bob Kimball's racist and sexist utterances.  The latter claim, if preserved, would fall under the retaliation rubric set forth in Burlington Northern & Santa Fe Railway v. White, 126 S. Ct. 2405 (2006) and, it would seem to me, would be much more easily supported because it could turn directly on the special cleaning project incident alone, without suffering from the attenuation that arises when the focus turns to the more belabored absenteeism project.  Such a claim does not appear to be inconsistent with the allegations of Puno's complaint.  With respect to the parties' summary judgment papers, neither identifies such a claim, but it is not necessarily Puno's obligation to articulate a claim that is not challenged in MDIH's motion for summary

judgment.[10]  Assuming that such a claim was preserved administratively, something the record does not reveal, it would appear to be viable for largely the same reasons that preserve the whistleblower claim discussed below.

Another potential Title VII employment discrimination claim would involve a theory that Puno was broomed out of MDIH not simply for complaining about HIPAA violations or about racist or sexist insults, but because she is a Filipino woman who stepped outside of her station when she complained about a favored white male co-worker's bigotry.[11]  This would essentially be the hostile work environment theory discussed above, but recast as a garden-variety discriminatory discharge claim.  I think the claim would be viable in one or more of these ways, resting in the overlapping region of a Venn diagram, where a particular group of characteristics justifies inclusion of a sample in either of two or more alternative sets.  In others words, Puno's sex and race claim is a hostile work environment/retaliation/wrongful discharge claim, as plead in her complaint under state and federal law.

## C.    Whistleblower Retaliation

"Section 4572(1)(A) of the [Maine Human Rights Act] makes it illegal for an employer to discriminate against an employee in retaliation for the employee's exercise of rights under the Maine Whistleblowers' Protection Act (WPA or MWPA)," 26 M.R.S.A. §§ 831-840.  Higgins, 194 F.3d at 261;  see also 5 M.R.S.A. § 4572(1)(A).  "The MWPA, in turn, protects an employee from discrimination when he has complained to the employer in good faith about a workplace-

---

[10]    Puno alludes to mixed motives, which might suggest the existence of a disparate treatment based on her termination or some other adverse employment action, but her allusion appears to be more designed to explain why her hostile work environment claim should be regarded as based on sex or race, even though "the HIPAA complaint may have been the trigger to provoke . . . race and sex based animosity."  (Pl.'s Opp'n Mem. at 13.)  In other words, Puno's point is that she was mistreated because she is a Filipino woman who made a HIPAA report, not exclusively because she made the HIPAA report.

[11]    Although it is admitted that these racist and sexist insults ceased after Puno reported them to Owen, there is an available inference that Owen failed to take them seriously enough to consider disciplining Bob Kimball or even to regard the conduct as retaliatory.

related condition or activity that he reasonably believes is illegal, unsafe, or unhealthy."

Higgins, 194 F.3d at 261 (citing 26 M.R.S.A. § 833(1)(A)-(B)).  The Act prohibits

discrimination regarding the employee's "compensation, terms, conditions, location or

privileges."  26 M.R.S.A. § 833(1).  In order to set forth a prima facie whistleblower claim, "an

employee must show (1) that she engaged in activity protected by the WPA, (2) that she

experienced an adverse employment action, and (3) that a causal connection existed between the

protected activity and the adverse employment action."  DiCentes v. Michaud, 1998 ME 227, ¶

14, 719 A.2d 509, 514; accord Blake v. State of Maine, 2005 ME 32, ¶ 7, 868 A.2d 234, 237;

Stanley v. Hancock County Comm'rs., 2004 ME 157, ¶ 11, 864 A.2d 169, 173-74.

MDIH concedes for purposes of summary judgment that Puno engaged in protected

activity when she made the HIPAA report.  (MSJ at 15.)  It also allows that the Kimballs'

conduct toward Puno was motivated by retaliatory animus.  (Id.)  MDIH argues, however, that it

never subjected Puno to an adverse employment action on account of her whistleblower activity.

This challenge is directed both to the existence of an adverse employment action (id. at 15-16)

and to the existence of a causal relationship between her protected activity and any adverse

employment action (id. at 17-18).  Puno responds that she suffered an adverse employment

action consisting of both a hostile work environment and her eventual termination.  (Opp'n Mem.

at 14.)  Thus, I turn to the question of whether the actions taken by MDIH following the

whistleblower activity, which culminated in Puno's termination, rise to the level of a materially

adverse employment action and whether there is a sufficient basis for the factfinder to infer that

this activity was a motivating factor in her termination.[12]

---

[12] In Burlington Northern & Santa Fe Railway v. White, the Supreme Court held, in the context of a Title VII retaliation claim, that an adverse employment measure "means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  126 S. Ct. at 2409.  Traditionally, when construing the reach and scope of the MHRA, Maine courts (state and federal)

The record reflects that MDIH supervisory personnel put in place, almost immediately following Puno's complaints, a heightened level of scrutiny focusing on Puno's previously tolerated absenteeism. That heightened scrutiny eventually led to Puno's termination for absenteeism, which serves as MDIH's ostensibly non-discriminatory justification for Puno's discharge. That termination was threatened in a letter requiring Puno to make it through a probationary period without a single unexcused absence. Puno successfully completed the term of probation. Nevertheless, MDIH terminated her in connection with her subsequent absences despite the fact that she was no longer on probation and despite the fact that she requested to receive transportation to work, transportation that Beaudoin had the discretion to provide. Viewed in the light most favorable to Puno, this sequence of logically connected events ticks off the remaining elements of Puno's *prima facie* case and would suffice to carry Puno's ultimate burden of persuasion. Although Puno's absenteeism certainly may have been the exclusive reason for her termination, the summary judgment record generates a genuine issue of material fact whether Puno's protected activity was a motivating factor because MDIH's zero tolerance approach to Puno's absenteeism arose immediately after her protected activity, relied on absences occasioned by emotional upset over harassment, was resolved in a manner that was in tension with the probationary model first imposed by Puno's supervisors (because Puno made it through the probationary challenge) and was manipulated by Beaudoin (who could fairly be viewed as a

---

look to Title VII case law for rules and standards. Gavrilovic v. Worldwide Language Res., Inc., 441 F. Supp. 2d 163, 177 (D. Me. 2006) (citing Me. Human Rights Comm'n v. Me. Dep't of Def. & Vet. Servs., 627 A.2d 1005, 1007 (Me. 1993)). In an earlier recommended decision, I expressed an inclination to apply the Burlington Northern standard to a claim made under the anti-retaliation provision of the MHRA, 5 M.R.S.A. § 4633. Lufkin v. E. Me. Med. Ctr., Civ. No. 05-106-B-H, 2006 U.S. Dist. LEXIS 46240, *50 n.10, 2006 WL 1892442, *16 n.10 (D. Me. July 7, 2006). However, unlike the anti-retaliation provisions of Title VII and the MHRA, which do not expressly limit "discrimination" to measures that affect the terms and conditions of employment, see 42 U.S.C. § 2000e-3(a); 5 M.R.S.A. § 4633, the language of the WPA is directed squarely at measures affecting the "compensation, terms, conditions, location or privileges" of employment, 26 M.R.S.A. § 833(1), a formulation that parrots the language of Title VII's anti-discrimination provision, 42 U.S.C. § 2000e-2(a)(1), rather than its anti-retaliation provision, and, therefore, the standard applied under the WPA for what constitutes an adverse employment action should be consistent with what is required to prove a claim under section 2000e-2 of Title VII.

retaliatory supervisor based on the "deep clean" incident) when he refused to provide Puno with transportation that he had afforded to others in need.  On such facts I recommend that the Court deny the motion for summary judgment on the whistleblower claim.

### Conclusion

For the reasons given above, I find that the summary judgment record generates a genuine issue of disparate treatment in the workplace based on sex, race or national origin as well as whistleblower retaliation.  Based on these findings, I RECOMMEND that the Court DENY the motion for summary judgment (Docket No. 7).  If the Court disagrees with my assessment concerning the hostile work environment theory and concludes that no other federal claim has been preserved, it may choose in its discretion to remand the whistleblower claim to state court.  See Cox v. Me. State Police, 324 F. Supp. 2d 128, 135 (D. Me. 2004) ("A federal court, in its discretion, may relinquish jurisdiction after removal when there is no longer a basis for federal subject matter jurisdiction.").  The parties are advised to address in their objections to this Recommended Decision their positions on the balancing test that governs the Court's exercise of discretion in regard to whether it should remand the pendent state whistleblower claim if it disposes of the federal claim(s), a question that was not addressed by either party in the original pleadings.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 28, 2007